Argued February 17, affirmed March 29, rehearing denied May 17, 1921.

## HAMILTON *v.* HAMILTON.

(196 Pac. 472.)

**Divorce—Precipitating Family Row Over Wording of Telegram Held Cruel and Inhuman Treatment.**

1. For a husband, two days after death of daughter, and when wife was ill, with a temperature of 103, to go to her room and abuse and criticise her and precipitate a family row about the wording of a telegram to him telling him of daughter's sickness, *held* cruel and inhuman treatment.

**Divorce—Findings of Trial Court Entitled to Weight.**

2. In a divorce case, where the evidence was in sharp conflict, and the trial judge saw and heard the witnesses testify and had more or less personal knowledge of them, the findings of the lower court as to questions of fact are entitled to some weight on appeal.

**Divorce—Father Should be Given Opportunity to See Child Awarded Mother.**

3. Divorce decree awarding custody of 18 year old son to mother should give the husband legal right to visit the son.

From Clatsop: JAMES A. EAKIN, Judge.

Department 1.

Plaintiff and defendant were married at Astoria, Oregon, on May 6, 1896, and are now husband and

---

1. Conduct amounting to treatment endangering life within statute defining grounds for divorce, see note in 5 A. L. R. 712.

wife. As the issue of such marriage, a son was born, named W. D. Hamilton, and who at the time the complaint was filed was fourteen years of age; also there was a daughter named Ione, who was born December 5, 1899, and died February 2, 1903. The plaintiff commenced her suit for divorce on May 24, 1917, and the amended complaint was filed January 17, 1918. It is founded upon alleged cruel and inhuman treatment commencing soon after the marriage and continuing to the 18th of February, 1903, when the plaintiff left the defendant and they have lived separate and apart ever since. It is alleged, in substance, that whenever the plaintiff asked the defendant for money to pay the household expenses, he would get very angry and work himself into a passion and would curse and abuse her, and that she "became fearful of her life, and her health became impaired to such an extent that it was impossible for plaintiff to live with defendant"; that he is a man of wealth and large income and was engaged in the practice of his profession as an attorney in the City of Astoria. That after the defendant left for California, the daughter, Ione, became seriously ill at Roseburg, that she notified him to come home and that he did not return until after the child had died; that in 1912, for the purpose of harassing and annoying the plaintiff, he stated to the son, W. D. Hamilton, in her presence, that unless the son deserted his mother when he arrived at the age of thirteen years, he would disown him, and made the statement for the purpose of getting even with the plaintiff. That about July 24, 1914, the defendant told the plaintiff that he would never have anything more to do with her whatever. It is then alleged that for many years the defendant had a housekeeper and that frequently and for the

purpose of harassing and annoying the plaintiff, he
would call her by the name of the housekeeper, to the
shame and humiliation of the plaintiff; that in Janu-
ary, 1914, he accused the plaintiff of not giving the
son proper training, and that she was raising him for
the penitentiary, and that she was an "incorrigible
woman"; that, notwithstanding his wealth, he refused
to permit her to go to any places of amusement where
an admission was charged or to go with her to such
places; that as a result of his continuous and harsh
treatment plaintiff's health was broken down and her
nerves were wrecked; that at divers and numerous
times and for many years, the defendant had com-
mitted adultery with his housekeeper and ste-
nographer and lived with her in the home which was
built for the use of plaintiff and defendant, to the
"humiliation, disgrace and shame of the plaintiff";
that since the 18th of February, 1903, she has had the
care, custody and control over the son, W. D. Hamil-
ton, "and has clothed, fed and paid for his educa-
tion"; that the only amount which the defendant has
contributed for that purpose is forty-one dollars per
month, which was not sufficient and that he has re-
fused to pay any more. It is then alleged that the
defendant is the owner of a large amount of real
property which is specifically described in the com-
plaint; that he is also the owner of personal property
which on information and belief is alleged to be of
the value of $250,000, all of which has been acquired
since their marriage. The plaintiff prays for a de-
cree for dissolution of the marriage contract and that
she have "an undivided one-third of all real estate
owned by the defendant" and that the court award
her suitable and reasonable alimony and such further
sum as may be just and necessary for the care and

education of the son "and equip him for a business career."

For answer the defendant admits that he has about $7,000 in money and $43,000 in personal property and is indebted in about $17,000, and that the plaintiff and defendant were married and are now husband and wife as alleged, and the issue of such marriage, and denies all other material allegations of the complaint. As a further and separate answer, the defendant alleges that he has always "treated the plaintiff in a kind, considerate and loving manner" and that he has "striven to the utmost of his ability to make her married life happy," that prior to the marriage, he had accumulated about $34,000, and that immediately after their marriage, out of his savings, he purchased ground and built and furnished a home at a cost of not less than $6,000; that he soon commenced the practice of law in the City of Astoria, and for the first few years had an income which did not exceed $100 per month, and from the beginning he provided the plaintiff with servants in the house. He alleges that he went to San Francisco for medical treatment, and that his failure to return in time and to be present during the last sickness of the daughter was upon account of a delayed telegram which the plaintiff sent to the defendant and her failure to answer a telegram which he sent to her; that upon his return to Roseburg on February 2, 1903, the plaintiff refused to greet him and left the room and "vowed she would never live with the defendant again, which vow plaintiff has kept"; that he has "sought the intervention of mutual friends to bring about a reconciliation; that plaintiff has always and without just cause or reason refused a reconciliation and insisted on continuing said abandonment and the desertion of

the defendant through all the years since February, 1903, notwithstanding which the defendant has continued to support and provide for her and their child''; that the son needs a father's advice and that he ''has a deep affection for him and a true interest in his welfare; that defendant is a fit and proper person to have his custody and control, of which he has been wrongfully deprived by the plaintiff.'' The defendant prays that the plaintiff's suit be dismissed and that he have a decree against her for an absolute divorce and for the custody of the son for at least half of the time.

The reply denies all of the material allegations of the further and separate answer.

Upon such issues, testimony was taken in open court in May, 1918, and in January, 1919, the court made findings of fact in substance and to the effect that the plaintiff at all times ''treated the defendant in the kind and loving manner as a kind and loving wife should treat her husband''; that the defendant in violation of his marriage vows, from a period soon after marriage and until February 18, 1903, ''treated the plaintiff in a cruel and inhuman manner, rendering her life burdensome, during which time the defendant without cause or provocation cursed and abused plaintiff, rendering her life burdensome.'' Upon that date she ''was compelled to and did leave the defendant, and neither plaintiff nor defendant have lived together since that date.'' Since the separation, the plaintiff has had the custody and control of the son ''and has properly cared for and educated him and has been a good mother to him.'' Findings are also made as to the real property owned by the defendant and its value and that he is ''the owner of a large amount of personal property, promissory .

notes, stocks and bonds, the value of which being difficult to determine." As conclusions of law, the court finds that the plaintiff is entitled to a decree of divorce and to the custody of the minor son, and for an undivided one-third interest in the real property and "to a judgment against the defendant for permanent alimony in the sum of five thousand dollars ($5,000)," and that "she is entitled to receive from the defendant, and defendant should pay plaintiff, for the care, clothing and education of said minor son, W. D. Hamilton, issue of said marriage, the sum of $50 per month, beginning on the first day of January, 1919, and each and every month thereafter until the further order of the court in the premises," and for her costs and disbursements. Based upon such findings and conclusions, the court rendered a decree in accord therewith, from which the defendant appeals, claiming that the court erred in rendering such a decree or any part of it, and "in failing to find and decree herein as prayed for in the defendant's answer to the amended complaint herein, * * in failing to decree that the defendant is entitled to the custody for a fair portion of the time of the son," and in failing to dismiss plaintiff's suit for want of evidence to justify a decree in her favor in that the decree is contrary to the law and the evidence.        AFFIRMED.

For appellant there was a brief over the name of *Messrs. Veazie, McCourt & Veazie,* with an oral argument by *Mr. A. L. Veazie.*

For respondent there was a brief over the names of *Mr. G. C. Fulton* and *Mr. A. C. Fulton,* with an oral argument by *Mr. A. C. Fulton.*

JOHNS, J.—Both parties are members of prominent pioneer families of the state. The defendant was a money-maker and at the time of their marriage had accumulated about $35,000. His income from his law business was not large and from that source it ranged from $500 to $1,000 per annum. Before their marriage the defendant had been a telegraph operator and had acquired the habit of keeping an accurate and detailed account of every dollar spent and received, and was close and penurious in money matters. He paid all the current monthly bills. Although she had credit at the stores, it was because she was his wife. It was not done by express words, yet she was made to know that she must be very close and economical in her personal affairs and household expenses. This, within itself is not a bad fault and is rather to be commended, but in all such matters her wishes were made subordinate to his own and everything was subject to his final approval. She had but little personal money of her own and what she did have was mostly received in small presents from her parents or from the sale of eggs and her work with the brush and needle. She says he seldom, if ever, took her anywhere that an admission fee was charged, did not want her to go, and her clothing which was purchased with his money was very simple and inexpensive, and that she was made to know and feel that she had to account to him strictly for every cent of money expended. There is testimony tending to show that upon the receipt of the current monthly bills, there was always fault-finding and criticism of the expenses, and at times that he was very unjust and unreasonable in such matters; in other words, for a man in his financial condition, he was very close, stingy and exacting. That although

the plaintiff was very economical, yet in the matter of household expenses she was not permitted to have an opinion or exercise her own judgment.

In January, 1903, the defendant went from Astoria to San Francisco for medical advice and the plaintiff with the two children and her mother, went with him as far as Roseburg, where they remained with his brother, Dr. Hamilton. While there, the daughter Ione took sick and died from the same trouble for which she had previously received medical treatment in Astoria. During the sickness of the daughter and realizing her serious condition, the plaintiff wired the defendant: "Ione seriously ill with blood poisoning. Come if you can." In response to this, the defendant wired plaintiff: "Your telegram delayed. How is Ione? Answer what ails her." Receiving no answer to this wire, the defendant sent the following telegram to his brother, Dr. Hamilton: "Discharge still declined. Remaining almost imperative. Spare no expense. Telegraph daily"—in response to which his brother wired him "that the child's condition was not improved and it was better to come immediately." The defendant then took the first train out of San Francisco and arrived in Roseburg on February 2d, 2 o'clock A. M., about two hours after the daughter had died. Upon his arrival, the plaintiff refused to greet him or speak to him. About two days after this, the defendant went to plaintiff's room, in which was her mother. Plaintiff then had a fever of 103 and was worn out and grieving from the loss of the daughter and was also taking care of the son who was then sick. What then happened is best told in the language of Mrs. Dement, mother of the plaintiff:

He "commenced to find fault with her about the way she telegraphed, about the way she worded her telegram that she sent to him when she was trying to

get him home, and he said he blamed her for not telegraphing, wording her telegram properly to induce him to come home and he was very angry and violent and abusive, and she undertook to tell him just what she said and how she worded that telegram, but he would not listen. He stood there towering over her with his left hand raised, and shaking his finger close to her face and saying: "No, you didn't, no, you didn't," over and over again, and would not listen to her at all; and I was very much excited, of course, and I turned away and started to the other side of the room and when, after I had taken a few steps, I heard a kind of a shuffling sound and heard Mrs. Hamilton say, "Stop," * * I didn't see anything, I didn't see anything but that—it was—the situation was extremely acute and I could not stand to look at it and turned away and started to cross the room—I had to do something, and I had never seen a man treat his wife so abusively as he was treating her at that time, and of course, I was naturally excited and considerably indignant, * * Oh, she didn't do anything but try to explain to him what she wrote in that telegram, and he would not—of course, he would not listen to her, and he was very violent and abusive in his manner and dominated her so that she could not do anything. She was sitting or leaning against the table, and she had her right hand down on the table to support herself. She was ill at the time, had a temperature of 103 at the time that altercation occurred, and she was hardly able to stand up. The doctor had told her to go to bed and stay there, but her baby was sick and she could not take care of that baby and stay in bed at the same time, so she did not follow the doctor's directions, she wasn't obeying, and I was there trying to help her."

1. That is also the substance of plaintiff's testimony on that point. As she said she would do, previous to the arrival of the defendant from San Francisco, the plaintiff there and then left him and they have never

lived together since. From Roseburg they both returned to Astoria and the plaintiff went to the home of her parents. Although her telegram could have been more specific, it was sent by a distressed and troubled wife. Within two days after the death of the daughter and in the physical and mental condition of the wife, the defendant had no right to go to her room and abuse and criticise her and precipitate a family row about the wording of the telegram. Under the conditions then existing, that was cruel and inhuman treatment.

Some time after this the defendant was in Portland, and while there, through an employment agency, for the first time met a woman with a small boy and girl, who had recently been divorced by her husband, to whom we shall hereafter refer as his stenographer. As a result of negotiations, the stenographer went to Astoria with her children to and in the home of the defendant, which was constructed soon after his marriage to the plaintiff. She did his stenographic work in his office and to all intents and purposes had charge of his household affairs and for a number of years they all lived together in his home, ate at the same table, slept under the same roof. The stenographer spent a portion of the following summer in defendant's tent at Seaside, where he visited her during week-ends and ate and slept in the same tent. The next summer he built a cottage named ''Broken Wing,'' where the stenographer again spent a portion of the summer and the defendant made like visits under the same conditions. During all this time the defendant bought all the groceries and paid all the household expenses for himself, the stenographer and her children and their visiting friends, for his home at Astoria and the tent and

cottage at Seaside. This mode and manner of living continued for several years, when the stenographer moved to Portland and there entered the employment of a firm of attorneys. In a short time the defendant also moved to Portland, where he opened a law office and the stenographer then ceased her employment with the firm and again entered the employment of the defendant, which continued for some time. It appears from their own testimony, that during a large portion of this period, they were rooming in the same hotel, and that, when a change was made by one, it was followed in a change by the other to the same hotel and that during some of the time, the defendant took a portion of his meals with the stenographer.

They both flatly deny that there was ever any adultery between them and testify that in their relations there was nothing improper, and that in all things he was a perfect gentleman and that she was a perfect lady. Yet it must be conceded, and upon that point their own testimony is conclusive, that covering a period of a long number of years the defendant had both the "time" and the "place" and that by every law of human nature, it is very suspicious that he had the "girl." Although such actions and conduct may not be sufficient evidence of adultery, yet when done and committed in the same city where the plaintiff and her family resided and in the same house which was built as a home for the plaintiff, with all the surrounding facts and circumstances, such things would tend to bring humiliation, shame and disgrace upon the plaintiff and are strong evidence of cruel and inhuman treatment. Again, the evidence tends to show that the defendant told his little son in the presence of his wife that if he did not desert his mother he would disinherit him. Much more could be said,

but it is unnecessary to this opinion. It is fair to say that appellant's attorneys have filed a very able and exhaustive brief in which they have made a critical analysis of the evidence.

2, 3. The testimony was taken in open court and in some of it there is a sharp conflict. The trial judge saw and heard the witnesses testify and had more or less personal knowledge of them. The defendant is an attorney of that court and of this court. The record is conclusive that the plaintiff is a pure, gentle and refined woman, and that she was a good and faithful wife. Under the surrounding circumstances, the findings of the lower court as to questions of fact are entitled to some weight. By its decree the plaintiff has the absolute custody and control of the minor son, who is now about eighteen years of age, but no provision is made for the father to visit the son or the son to visit the father. In that respect, it should be modified so that the father at reasonable times shall have the legal right to visit the son, and in his reasonable discretion, the son shall have the right to visit the father. If the parties here cannot work out and agree as to what is fair and right in such matters, upon notice, either may apply to the lower court for a more specific decree in that particular. In all other respects, including costs and disbursements, the decree is affirmed.    AFFIRMED.    REHEARING DENIED.

BURNETT, C. J., and HARRIS and BENSON, JJ., concur.